

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. AP-77,036

### JUAN BALDERAS, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 1412826
### IN THE 179TH DISTRICT COURT
### HARRIS COUNTY

RICHARDSON, J., filed a concurring opinion in which MEYERS, JOHNSON, and NEWELL, JJ. joined.

### CONCURRING OPINION

I join the majority's decision to affirm the judgment of the trial court.

## A.     Speedy Trial

Among his points of error, Juan Balderas claims that the trial court erred by not granting his motion to dismiss for lack of a speedy trial.  Balderas was arrested for Eduardo Hernandez's murder in December of 2005.  General voir dire began eight years later on January 13, 2014.  However, Balderas did not file his Motion For A Speedy Trial until

January 17, 2014. In this motion, Balderas (1) claimed that the State has not made a diligent effort to pursue a trial for the eight years he has been incarcerated; (2) asserted that he "has at all times been ready for trial;" and (3) "requested that the above entitled matter be brought to trial." The trial court held a hearing on Balderas's motion on February 12, 2014. Although Balderas filed his motion for speedy trial after trial had begun, his attorney explained to the court that Balderas was seeking a dismissal based on lack of a speedy trial. At the hearing, the State presented evidence that, early on, the defense sought additional time to create a mitigation packet in an effort to persuade the State to not seek the death penalty. The trial court's docket sheet reflects that on May 12, 2010, trial was reset at the request of the defense. From January 2008 through December 2014, the court's docket sheet reflects seven trial resets "by agreement of both parties." At the hearing, the State presented testimony that, on May 10, 2012, the trial court granted a motion for continuance filed by the defense "over strong objection by the State," and in August of 2012, another defense motion for continuance was granted over strenuous objection by the State. The trial court denied Balderas's motion. This Court evaluated the trial court's decision, applying the *Barker v. Wingo*[1] factors. I agree with the majority's conclusion that Balderas's right to a speedy trial was not violated.

## B.      Sufficiency of the Evidence

Balderas also claimed that the evidence was insufficient to support his conviction. I agree with the majority that the evidence linking Balderas to the shooting of Eduardo

---

[1] 407 U.S. 514, 530 (1972).

Hernandez, both of whom were members of the La Tercera Crips street gang, was sufficient to support the jury's verdict. Officers received an anonymous tip that caused them to suspect Balderas of killing Eduardo. After eyewitness Wendy Bardelas viewed a photo lineup, she identified Balderas as the shooter. The officers obtained an arrest warrant, and went to where they believed Balderas was residing. When he saw the officers approaching, Balderas dropped a large black bag and green tote box he'd been carrying and fled on foot. The officers pursued Balderas and eventually spotted him hiding under a parked vehicle. The murder weapon, a silver .40 caliber handgun, was recovered by police from one of the containers Balderas had dropped. A magazine clip that fit the handgun was found in Balderas's rear pocket.

Israel Diaz, who was also a La Tercera Crips gang member, testified to the following: (1) About three to four days before the killing, gang members met to discuss Eduardo's disloyalty to the gang. (2) They decided that Eduardo needed to be killed. (3) It was "understood" by the gang members that, although any member could do the killing, the most likely one was Balderas since he had brought Eduardo into the gang. (4) Diaz became aware Eduardo was killed three days later when "one of the guys" called him. (5) Diaz went to the crime scene on the night of the offense. He saw police vehicles and an ambulance. Diaz saw Balderas "a few steps away from the apartments." Balderas was wearing a dark sweater-like shirt and khaki pants. (6) Diaz said that Balderas approached Diaz and the other gang members who were there and "he just hugged everyone like sort of when you haven't seen

nobody in a long time, like joyful, and he gave each individual a hug and when he got towards me, he gave me a hug and a kiss on the cheek," which was unusual. (7) Diaz testified that Balderas "basically just took credit for the whole thing," and that Balderas said "he got him, he finally got him." Diaz said that Balderas "had his [silver] handgun and he was just exchanging the magazine, the clip."

According to officer testimony, earlier on the day of the offense, Eduardo was visited by Jose Vasquez, a fellow gang member who, on that day, was wearing a red H.E.B. shirt. After Vasquez talked to Eduardo, Eduardo became very upset and concerned that he might be in trouble with his fellow gang members for socializing with members of other gangs and prioritizing his girlfriend, Karen Bardelas. In the course of their investigation, the police looked at Balderas's phone records. On the date of the offense, Balderas called Jose Vasquez at 7:41 p.m. and again at 9:56 p.m., which is near the time that Eduardo was killed. The investigating officers believed this evidence to be a significant link between Balderas and Eduardo.

## C. The Pre-trial Identification Procedure

Balderas claims that the photo lineup shown to Wendy Bardelas—the only eyewitness to identify Balderas as the shooter—was impermissibly suggestive. He claims that, as a result of the improperly suggestive photo array, Wendy's in-court and out-of-court identifications of him should have been suppressed.

"Due process requires the suppression of an in-court identification only if (1) an impermissibly suggestive out of court procedure (2) gave rise to a very substantial likelihood of irreparable misidentification."[2] In *Barley v. State*, this Court held that a pre-trial identification procedure may be suggestive, "but not *impermissibly* so."[3] Suggestiveness may be created "by the content of the line-up or the photo array itself if the suspect is the only individual closely resembling the pre-procedure description."[4] That is what we have in this case. Wendy described the shooter as wearing a black hooded sweatshirt and having a dark birthmark on his face. She was shown a photo array in which Balderas was the only person fitting this description. He was the only one in the photo array wearing a black hoodie (although one other man was in a dark grey hoodie) and the only one with a dark mark on his left cheek. Even though it was established through testimony that this mark was not a birthmark, but was a scratch, Balderas was still the only person in the lineup with this distinctive type of mark on his face.

Nevertheless, "a suggestive identification procedure does not, in itself, intrude upon a constitutionally protected interest."[5] Even if the pretrial identification procedure was

---

[2] *Williams v. State*, 937 S.W.2d 479, 488 (Tex. Crim. App. 1996) (citing *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

[3] 906 S.W.2d 27, 33 (Tex. Crim. App. 1995).

[4] *Id.*

[5] *See Jackson v. State*, 657 S.W.2d 123, 130 (Tex. Crim. App. 1983) ("[I]t is well established that, even where the pre-trial identification procedure is impermissibly suggestive, in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court

impermissibly suggestive, Wendy's identification of Balderas as the shooter could still be considered reliable under the totality of the circumstances.[6] We assess reliability by weighing five factors against the corrupting effect of any suggestive identification procedure: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at that confrontation; and (5) the length of time between the crime and the confrontation.[7] While I would view the pre-trial identification procedure as suggestive, and perhaps impermissibly so, I agree that Wendy's identification of Balderas as the shooter was reliable under the totality of the circumstances.

1.      The opportunity of the witness to view the suspect at the time of the crime

Wendy testified that she was sitting in front of the couch in the small apartment when the shooter entered. She said that he was in the apartment for what seemed like "an eternity," and she was watching him the whole time he was there.

2.      The witness's degree of attention

Wendy testified that the entire time that the shooter was in the apartment, she was looking at him. She said her eyes followed him everywhere. She did not move from the spot where she was sitting because she "was frozen." When Wendy was taken to the police

---

identification.").

[6] *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008).

[7] *Id.*

station on the night of the offense, she told the police that she had seen the shooter's face. Wendy testified that, although she was "in shock" during the shooting, she was able to get a good look at the shooter's face. Wendy said that she saw the shooter's face when his hood fell down off of his head.

At the time, Wendy did not immediately recognize Balderas. It did not register with her that she had met him before. Wendy explained that, "At that moment, [her] mind was not all put together, and [she] just couldn't think. [They] were just playing, doing nothing, he arrived. And then, just all the sudden, this happens." She said that she was "in shock," and that she was "frozen" because she had just "seen someone killing [her] friend." The following exchange took place during the suppression hearing outside of the jury's presence:

> Q. You didn't think at the time to tell the police, I know who this guy is and I've seen him four weeks ago?
>
> A. At that minute, I couldn't even think right.
>
> Q. If you couldn't think right, then how did you give a statement to the police?
>
> A. Because he asked me to tell him what I had remembered and I was trying to remember what had happened right there and then.
>
> Q. And after they asked you this, you said you had never seen him before, right?
>
> A. Yes.
>
> Q. But now you're telling us that that was not true, right?
>
> A. Now and before. Later on when I gathered all my thoughts that I was thinking everything over, right? Then I remember him.

3.      The accuracy of the witness's prior description of the criminal

In the statement Wendy gave to the officers on the night of the shooting, she described the shooter as "Hispanic and about 16-17 years old." She said he was about 5'5" to 5'7" tall, and he had "a dark birth mark on his face."[8] Wendy described him as "clean shaven" and "very skinny." She said he had short black hair in a "fade type haircut," and "he was wearing a black sweat shirt hooded jacket and khaki pants." This was an accurate description of Balderas.

4.      The level of certainty demonstrated by the witness at the confrontation

Wendy said that, when the officer showed her the photo lineup with Balderas in it, she was able to identify Balderas. Pointing to Balderas's photo, Wendy told the officer that, "he's the one that was running around, and he's the one that killed Eduardo." Wendy testified that when she saw Balderas's photo in the photo spread, she "went back to that night and it was him, the person that [she] saw." Wendy said that she did not even notice that he was wearing a black hoodie in that photograph. When testifying at trial, Wendy made an in-court identification of Balderas as "the one who shot Eduardo." When asked if the person she picked out in the photo spread as the shooter is the defendant, Wendy replied, "yes."

_____

[8] Much was made of Wendy's statement to the police on the night of the killing that the shooter had a dark birthmark on his face. But, at the suppression hearing, she agreed that the mark on the left side of Balderas's face in the photo lineup was a scratch, not a birthmark. Likewise, the police officer who showed Wendy the photo lineup six days after the shooting testified that he would agree that whatever mark that was on Balderas's cheek in the photo lineup was not a birthmark or any kind of permanent mark, and that there was no dark birthmark on Balderas's cheek at trial similar to the one on his face in the photo lineup. At trial it was shown that Balderas does have a mole on his right cheek that is not visible on the photo in the lineup.

The officer testified that, when he first showed Wendy the photo lineup, Wendy "immediately pointed to the male in Position No. 5, Juan Balderas, and said that she knew him as Apache. . . . She told me that he looked like the shooter." He said that Wendy told him she had not seen Apache for six months, but that "his face looked exactly like the shooter's face." He confirmed that Wendy seemed certain in her identification, that she did not hesitate or stare at the photo spread for any length of time before she picked him out and said that she was positive that Balderas's face was the same face as the shooter.

Because the officer was somewhat "confused" about the words Wendy used to identify Balderas as the shooter, he decided to meet with Wendy the next day to get clarification on her identification. He said that, when he showed Wendy the same photo spread he had shown her the day before, she confirmed that Balderas was the shooter. "She then said Apache did the killing. She stated she was absolutely positive the male in the picture was the same male that killed Eduardo." Wendy then asked the officer if she could write in Spanish on the back of the photo array that she was positive about her identification of Balderas as the shooter. The officer also agreed that English was Wendy's second language and that perhaps there had been a communication problem that would explain why her statements regarding the photo spread the day before confused him.

5. The length of time between the crime and the confrontation

The officer showed Wendy the photo lineup with Balderas's photo on December 12, 2005, six days after the offense occurred. The photo of Balderas in the photo array was an

H.P.D. booking photo that was probably taken in November of 2005. Although the trial took place several years after the offense occurred, Wendy's identification of Balderas as the shooter occurred only days after the offense.

**D.**    **Conclusion**

Therefore, even if the photo array might have been suggestive, I agree with the trial court's conclusion that the totality of the circumstances reveals no substantial likelihood of misidentification. Therefore, I concur in the majority's disposition to affirm the judgment of the trial court.

FILED:    November 2, 2016

PUBLISH